IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA


TRACY D. FULLEN,

        Plaintiff,

    v.                          Civil Action No.5:07-CV-93


MICHAEL J. ASTRUE,
Commissioner of Social Security,

        Defendant.

## REPORT AND RECOMMENDATION
## SOCIAL SECURITY

### I. Introduction

A.    <u>Background</u>

       Plaintiff, Tracy D. Fullen, (Claimant), filed his Complaint on July 24, 2007 seeking

Judicial review pursuant to 42 U.S.C. §§ 405(g) and 1381(c)(3) of an adverse decision by

Defendant, Commissioner of Social Security, (Commissioner).[1]  Commissioner filed his Answer

on September 20, 2007.[2]  Claimant filed his Motion for Summary Judgment on October 19,

2007.[3]  Commissioner filed his Motion for Summary Judgment on November 15, 2007.[4]

B.    <u>The Pleadings</u>

      1.    <u>Plaintiff's Memorandum In Support of Motion for Summary Judgment</u>.

      2.    <u>Defendant's Brief In Support of Motion for Summary Judgment</u>.

---

[1] Docket No. 1.

[2] Docket No. 5.

[3] Docket No. 8.

[4] Docket No. 9.

C.    Recommendation

I recommend that:

1.    Claimant's Motion for Summary Judgment be **<u>GRANTED</u>** and the case REMANDED for further determination of Claimant's RFC and, specifically, consideration of the limitation identified by the ALJ as arising from Claimant's learning disability.  The Court so recommends despite finding the ALJ's findings regarding the severity of Claimant's learning disability, analysis of the Listings, and Claimant's RFC are supported by substantial evidence.

2.    Commissioner's Motion for Summary Judgment be **<u>DENIED</u>** for the same reasons set forth above.

## II.  Facts

A.    Procedural History

Claimant filed an application for disability insurance benefits on January 18, 2005, alleging disability since December 31, 1995 due to problems with his neck, shoulders, back and ankles, and Charcot-Marie-Tooth (CMT) disease, and a learning disorder.  (Tr. 64).  His application was initially denied on March 22, 2005 and upon reconsideration on August 1, 2005. Claimant requested a hearing before an Administrative Law Judge, ["ALJ"], and received a hearing on August 30, 2006.  On October 24, 2006, the ALJ issued a decision adverse to Claimant.  Claimant requested review by the Appeals Council.  The Appeals Council denied review and Claimant filed this action, which proceeded as set forth above.

B.    Personal History

Claimant was 41-years-old on the date of the August 30, 2006 hearing.  Claimant obtained his high school diploma and has prior work experience as a truck driver.

C.  <u>Medical History</u>

The following medical history is relevant to the time period during which the ALJ

concluded Claimant was not under a disability: June 4, 2004 through May 30, 2006:

**<u>University Health Associates, 9/17/98, (Tr. 199)</u>**
Gait: slightly unsteady.
Muscle tone: good
Muscle Exam: 4+, 4-, 5.
Reflexes: 0, 1+.

**<u>West Virginia University Hospitals, 9/17/98, (Tr. 203)</u>**
<u>Specimen Result</u>: This individual possesses a duplication of the peripheral myelin protein
(PMP22) gene and therefore is likely to be affected with or predisposed to Charcot-Marie-Tooth
disease, Type 1A (CMT1A).

**<u>MedBrook Medical Center, 9/15/99 (Tr. 209)</u>**
<u>Extremities</u>: Upper - normal; lower - normal; spine - normal.
<u>General Comments</u>: normal exam

**<u>MedBrook Medical Center, 4/26/99 (Tr. 210 )</u>**
<u>Assessment</u>: Sinusitis; Bronchitis.

**<u>MedBrook Medical Center, 4/10/99 (Tr. 211)</u>**
<u>Assessment</u>: Cyst check, healing; Right elbow bursitis.

**<u>MedBrook Medical Center, 4/5/99 (Tr. 212)</u>**
<u>Assessment</u>: Recheck cyst; Much improved. Continue Augmentin.

**<u>Shiv Uchila Navada, M.D., 1/18/05, (Tr. 221)</u>**
<u>Objective</u>: He was alert and oriented.  He seemed frustrated.  Strength was normal in the upper
extremities.  Ankle dorsiflexion was 4/5 as was plantar flexion.  Reflexes were hypoactive.
Plantar responses were flexor.  He has a slight antalgic gait.

<u>Summary/Interpretation</u>:
1) Peroneal motor amplitudes were markedly decreased bilaterally as were conduction velocities.
2) Tibial motor amplitudes were markedly decreased bilaterally as were conduction velocities.
3) Sural sensory responses were absent bilaterally.
4) Electromyography revealed chronic denervation changes in distal limb muscles.

<u>Impression</u>: This study is abnormal and is supportive of moderately severe sensory motor
polyneuropathy with evidence of axonopathy. In the context of appropriate family history, the
changes noted would be consistent with Charcot-Marie Tooth disease.

<u>Assessment</u>: 1) Charcot-Marie tooth disease; 2) Ankle instability.

<u>Plan</u>:
1) Tracy underwent eletromyography which was supportive of sensory motor polyneuropathy.
2) I reviewed records that he brought with him. His lumbar MRI showed disc bulges without herniation. Thoracic MRI was normal.
3) He is being referred to Dr. Darmelio for management of ankle instability.
4) As his condition is likely to deteriorate with time. He wanted to know if he should apply for disability. I feel it's not an unreasonable option.
5) After discussing side effects, he's being started on Cymbalta 30 mg. Samples were given.
6) He will call back in several weeks to let me know how he's doing.

**DDS Physician, 3/11/05 (Tr. 227)**
<u>Physical Residual Functional Capacity Assessment</u>
No data.

**James Capage, Ph.D., 3/11/05 (Tr. 235)**
<u>Psychiatric Review Technique</u>
<u>Medical Dispositions</u>: Insufficient Evidence prior to DLI.
<u>Consultant's Notes</u>: 40 year old male with a 12th grade education and past work as a truck driver alleging disability secondary to a learning disability. There is no information to assess the claimant's functioning prior to his DLI of 3/31/01.

**William K. Seltzer, Ph.D., Athena Diagnostics, 9/30/98, (Tr. 251)**
<u>Interpretation</u>: This individual possesses a duplication of the peripheral myelin protein (PMP)-22) gene and therefore is likely to be affected with or predisposed to Charcot-Marie-Tooth disease, Type 1A (CMT1A).

**Shiv Uchila Navada, M.D., 10/5/04, (Tr. 252)**
<u>General Examination</u>:
  <u>Neurology</u>: Mental Status - He was alert and was oriented in all spheres. He seemed a little frustrated. He has a tendency to jump from one symptom to another.
  <u>Motor</u>: he has atrophy of distal muscles. Strength of distal muscles were 4/5. Proximal muscles were 5/5.
  <u>Gait and Station</u>: He had difficulty walking on his toes as well as on his heels. He also had some trouble tandem walking.
  <u>Muskuloskeletal</u>: Neck and lumbar ranges of motion were full. Straight leg raising test was negative. Left shoulder abduction beyond 90 degrees caused pain. He had high-arched feet bilaterally with hammer toes. He has some tattoos over his upper extremities. Thoracic spine MRI was normal. Lumbar spine MRI revealed disc bulges at multiple levels. Shoulder X-ray showed degenerative changes.

Impression:
    1) Charcot-Marie-Tooth disease
    2) Cervical and dorsal myofascitis.
    3) Arthopathy of left shoulder.
    4) Ataxia.

Discussion:
    3) He does have some degree of ataxia. However, this is felt to be exclusively due to the fact that he has neuropathy.

    4) He indicated that you have scheduled a number of tests. He is still contemplating whether to undergo these tests or not. I've urged him to contact you regarding this.

    5) He has a long history of neck pain, lower back pain and shoulder pain. This is felt to be mostly soft tissue related. He did not wish to be placed on any medications for the same and did not wish to have this pursued further.

    6) Considering that he has not been employed since 1992 and considering the fact that he has fairly prominent polynueropathy along with some learning disability, it is very unlikely that he will be able to find any form of suitable employment. He has not applied for welfare/disability for fear that the departments may look down upon him. Nevertheless, I have suggested that he should reconsider this option.

**Matthew P. Darmelio, M.D., 3/23/05, (Tr. 260)**

Physical Examination: On exam, he does have weakness in eversion and some wasting of the peroneal areas. He has the cavus type foot. He has some sensory changes as well.

Plan: We found some braces to wear for these chronic ankle sprains to help prevent eversion. We're going to order those and see how they look.

**Kelly R. Nelson, M.D., 9/28/05, (Tr. 266)**

This is a letter in regards to Mr. Fullen and his current complaint of increase of his leg pain and neuropathy which is decreased sensation and numbness in his legs. He does have marked Charcot-Marie-Tooth disease with evaluation by several other specialists here in the area. This letter is in regard to him and his current state. At this time he is having increased pain in this area and up his ankles and legs due to progression of his disease. He is limited at this time in his mobility especially on uneven grounds and he is limited on his driving ability. At some point he was a truck driver in the past. He is having some ataxia also. He also has marked ankle instability due to progression of this disease state that he has. He is currently not taking any medication for it due to the fact that he does not like the effects of narcotics which seem to help with the pain minimally. He does have some history of pain in the upper shoulders and back pain due to some soft tissue muskuloskeletal problems at this time. The state that he has been in I do encourage him to seek disability because of this condition and the increasing discomfort and instability of the ankle and neuropathy of his lower extremities. He also does have some slight degree of depression due to the fact that he is unable to do things and things that he enjoys due to

the pain and instability of the ankle because it rolls very easily and his mobility is limited at times. . . .

**Ludwig Gutmann, M.D., 9/29/05, (Tr. 267)**
This patient has a well-established diagnosis of Charcot-Marie-Tooth disease with a strong family history. Nerve conduction studies in 1998 here showed conduction velocities from 16.9 to 19.4 meters per second associated with prolonged distal motor latencies and no sensory nerve action potentials.

Currently, his major problem is walking, and this relates to the fact that his feet tend to invert. His posterior tibial muscle strength is 5 while the pernoei muscles are 4. Anterior tibial muscles are 4 and gastrocs are 5.

I discussed the problem with Mark Gorman. The patient would benefit from a hinged AFO that allows up and down movement while limiting lateral movement. He will make an appointment to see Mark Gorman in the future.

The patient has sufficient difficulty in walking that this represents a significant disability at the present time. The problem will continue to slowly worsen over the years.

**Medbrook Medical Center, 5/25/05, (Tr. 285)**
Observation: Physical examination shows lungs are clear to auscultation. Heart regular without murmur. Head, eyes, ear, nose and throat, otherwise, essentially normal. There is marked decreased range of motion and limitations of movement due in his lifestyle. He is unable to do a deep knee bend on examination at this time. Xrays show no acute process but maybe some early arthritis. He has disc bulging in the lumbar spine. He has a history of CMT. Back pain is normally like an ache deep in the lower back, more sharp stabbing pain in the cervical and shoulder areas.

**United Hospital Center, 5/25/05, (Tr. 286)**
Right knee 5 views: The bones, joints, and soft tissues are within normal limits. There is no evidence of fracture.
Impression: No evidence of fracture.

**Medbrook Medical Center, 2/4/05, (Tr. 289)**
Patient is here today complaining of lower back pain. This has been a chronic problem for this patient. He has been referred to neurosurgery as well as neurology. He states that he has not worked for ten years and he is applying for disability. He wants me to write a letter stating that he is disabled. He states that he also suffers from ____. Patient got very upset when I stated that I could not write a letter in regards to his disability because I had never seen him before. He has been followed by Dr. Bailey in the past and he was advised to schedule an appointment with Dr.

Bailey. The patient got upset and left the exam room before the visit was complete.

**Dr. J.D. Bailey, M.D., 10/25/04, (Tr. 292)**
<u>Medical Examination Report</u>: All "Body Systems" Normal

**United Hospital Center, 6/28/04, (Tr. 297)**
<u>Findings</u>: There is no evidence of compression fracture. Normal alignment is seen. L2-3 appears normal. At L3-4 there is mild diffuse disk bulge and facet hypertrophy without spinal stenosis. At L4-5 there is disk dessication, diffuse disk bulge with mild flattening of the thecal sac and moderate narrowing of the left neural foramen. The disk is adjacent to the left S1 nerve although there is no displacement.

<u>Impression</u>: Disk bulge at multiple levels. At L5-S1 there is narrowing of the left neural foramen.

**United Hospital Center, 6/28/04, (Tr. 298)**
<u>Findings</u>: The vertebral bodies and discs have normal signal. There is no evidence of disc bulge, herniation, or significant degenerative change. Neural foramina are patent. There is probably some degenerative disk disease at C5-6 although this level is not well visualized on this thoracic spine exam.

<u>Impression</u>: Normal exam of the thoracic spine.

**Medbrook Medical Center, 6/22/04, (Tr. 299)**
<u>Observation</u>: Normal. Lungs are clear. Heart is regular rate and rhythm without murmur. Back shows minimal perivertebral tenderness throughout the thoracic and lumbar region. No point tenderness. The groin shows some erythematous type rash. Left shoulder shows some pain with abduction past about 60 degrees. Neuro exam on that arm is normal. No point tenderness anywhere. The skin tags are in the right inguinal region. X-ray of the left shoulder shows degenerative disease.

<u>Assessment</u>: 1) Thoracic and Lumbar pain; 2) Skin tags; 3) Shoulder pain, DJD.

**United Hospital Center, 6/22/04, (Tr. 300)**
No fracture seen. No dislocations are noted. Some degenerative changes humerus are seen.
<u>Impression</u>: degenerative change but no fracture dislocation.

**Medbrook Medical Center, 11/3/02, (Tr. 304)**
<u>Assessment</u>: Low back pain.

**United Hospital Center, 11/3/02, (Tr. 305)**

No loss of vertebral body height or disc space narrowing is seen.  There is very mild sclerosis of L5-S1 facet joints.  Incidental note is made of fusion of the L4-L5 transverse processes on the right which is a normal varient.

Impression: No acute abnormality of the lumbar spine identified.


**United Hospital Center, 2/20/06, (Tr. 314)**

Impression: Degeneration of the LF-S1 disc with left-sided foraminal narrowing due to lateral disc herniation.  This finding is unchanged from June 28, 2004.

I have been asked to view this MR and compare with the prior study.  I believe my report is correct.  The prior study describes mild diffuse bulges at L3-L4 and L4-L5 which I believe are within normal range and therefore I described these levels as showing no abnormality.  At L5-S1 there is narrowing of the left neural foramen which was described in the prior report and I do not see the diffuse change.  I believe this does represent a tiny focal herniation of disc material which is best appreciated in the sagittal view.  I do not see a change from the prior consensus report from the American society of neuroradiology and the describing focal abnormalities of the disc as herniations.  As a result many abnormalities that were described as bulges in the past are not called herniations.  The consensus report also emphasizes that the term "herniation" does not necessarily imply a surgical condition but simply the morphologic characteristic of the disc abnormality.


**Medbrook Medical Center, 2/15/06, (Tr. 317)**

Observation: Tenderness in the left lower back.  Neuropathy in the lower extremities.  Repeat MRI to see if anything has changed.

Assessment: Pain


**Shiv Uchila Navada, M.D., 4/12/06, (Tr. 319)**

Objective: He was alert and oriented.  His speech was clear.  Cranial nerves were normal.  Strength of hands were 4/5.  Proximal muscles were normal in strength.  In the lower extremities, distal muscles were 4/5 while proximal were 5/5.  He had minimal hypalgesia involving his thumbs.  He was areflexic in the upper and lower extremities.  He tended to drag his feet while ambulating. Straight leg raising test was negative.

Assessment: 1) Polyneuropathy/Charcot-Marie tooth; 2) Weakness of arms; 3) Possible bilateral carpal tunnel syndrome.

Plan:

1) Tracy was evaluated with electromyography.  This showed evidence of fairly severe polyneuropathy.

2) Median motor distal latencies were delayed out of proportion to the ulnar.  Although in the presence of polyneuropathy, superimposed entrapment neuropathy such as carpal tunnel

syndrome cannot be ruled out or confirmed with certainty the difference in distal latency between the median and ulnar suggests superimposed bilateral carpal tunnel syndrome.

3) The carpal tunnel syndrome does not however require intervention as I am not hopeful that surgical intervention will substantially benefit him.  He is also not in favor of this at this time.

4) At this time he is only able to function at home.  He is unable to be gainfully employed.  He looks after his 10 year old daughter who also has Charcot-Marie tooth disease.

D.     <u>Testimonial Evidence</u>

Testimony was taken at the August 30, 2006 hearing.  The following portions of the testimony are relevant to the disposition of the case.

[EXAMINATION OF CLAIMANT BY ALJ]  (Tr. 329)

Q      And how far did you go in school?

A      I graduated with - -

Q      High school, or?

A      Yes, sir.

Q      And, were you in regular or special classes?

A      I was in LD classes from kindergarten through my senior year the entire time.

Q      Okay.  Are you able to read and write English?

A      A little, yes.

Q      Did you ever have any vocational training after you left high school?

A      After I left, no.  In high school, yes.

Q      What did you have in high school?

A      The only thing that they offered at the time was masonry or carpentry, and I had carpentry, which I - -

\*          \*          \*

Q      Okay.  Now you indicate that you've been disabled since around '95.  And, but it looks like you last worked for a period of time for a couple of trucking companies in 2002, Edwards Transportation out of Ravenswood and On-One Trucking out of West.  What did you do for them?

A      I drove a semi.  That's pretty much, I, that's what I've done my whole life or career, whatever.

Q      You did.  Yeah.

A      I - -

Q      And how long did, how did you work at Edwards and One-One?

A      To be honest, sir, I don't really recall the exact amount of time.  I'd have to look that up.

Q      So - -

A      I was there for, I was there for a while.  And then I left.  And.

Q      Why did you leave those jobs?

A      Well, I just got to where I couldn't perform them any more.  I couldn't do the tasks that they were wanting me to do.  I was unable to drive 2,500 miles a week.

Q      So, why not?  You mean, you need, sir, you need to be more specific.  Tell me why you - -

A      I, I don't - -

Q      Specific.  Tell me why you, what, what was going on?

A      Between my shoulders bothering me.  My feet and ankles bother me.  Being able to concentrate and, and focus on the road for hours and hours on time, and on end.  I just got to where I could not perform the job.  And a lot of pain, difficulty sleeping.  And, there's just too many cars.  Today's, there's more traffic.  I just could not perform the job that I loved to do so much.

Q      Now before that, you were working up to about '97 for different trucking companies, Apta [phonetic] Trucking, RWB Personnel Leasing, Old Castle Northeast, PCD Transport, Able Moving, and Carmack [phonetic] Moving, Coastal File Drive, File Driving, Laborant?

A      Yes.  Those were all truck driving jobs.

Q      J. F., A.J, [INAUDIBLE].  That's  basically, you've done nothing but driving a truck all your life?

A      Yes.  That's correct.   I - -

Q      Okay.  And then when did you stop, well other than these last two jobs in 2002, looks like you stopped driving around '96, '96 or '97.

A      I stopped driving - -

Q      '95.  Yeah.

A      In '95.

Q      And what happened then?

A      Well, I was in a lot of pain, and, and having difficulty with all the tasks to perform in the job.  And I, and I my, I went and applied for Social Security disability or

whatever.  And, they denied me.  So I tried to go back, and it didn't work too well.  So, I took a little time off, tried to go back again.  It didn't work.  So then I just gave up.

*          *          *

Q	Well what kind of, what kind of limitations do you have now?  Or, five, you know, four, five years ago up to now?  What, why couldn't you do some other job?

A	I, I don't really know how to answer that question.  I have so many limitations, I don't know where to begin.  Between my, being unstable to walk - -

Q	Uh-huh.

A	Arthritis in the knees and lower back.  My hands have now quit working.  And, just be basically - -

Q	[INAUDIBLE] - -

A	Being in so much pain.  Now, I was doing like Tylenol and hot showers and Ben-Gay and stuff.  And now that doesn't work.  So I went to the doctor to get some drugs, or prescriptions or whatever that, that would help.  I really don't know what other job, I'm, I'm suited for.

*          *          *

Q	How far are you, how far are you able to walk normally?

A	I, I, the distance is not really the problem.  It's the terrain that is the problem.  I can't walk on grass, dirt, anything without these leg braces.  Concrete, I'm I'm okay, I'm halfway stable without these.  But, distance is not as much a problem as terrain is.

Q	So, so if you're, you're able to walk through like a shopping mall - -

A	Yeah.

12

Q      Or grocery - -

A      Yes.

Q      Store, or stuff - -

A      Yes, sir.

Q      Like that?

A      Yeah.  Walking through there, that's not really too difficult for me.  Stairs are a problem.  Gravel, dirt, and that, that is a real problem.  But - -

Q      Now, do you, you, you wear braces on both legs.  But is that, is that all the time, or just when you over uneven terrain?

A      Mostly on uneven terrain.  Occasionally, I wear them like today, if my, if I'm sprained my ankle or it's hurting, or it it's causing me pain, I'll just wear them to, I, I don't want my muscles to, to get dependent on them.  So I try not wear them any more than I have to.  So, I try to just - -

Q      Do you, how, how long, if you're able to like stand at a sink or stove, how long are you able to stand at a stretch?

A      To be honest with you, I've never really timed myself.  I don't really know.

Q      Any problems with it?

A      I have more problems with sitting for a long time.  Sitting for more than an hour gets extremely difficult.

Q      What happens when you sit for more than an hour?

A      Back pain, lower back pain.  Upper shoulder and neck pain.  Just real discomfort.

Q      And who do you deal with that?

A       I stand up.  Standing is a little bit easier for me than, than sitting, or - -

Q       You, you know of any, any problem, problems with your hands or fingers?

A       Tremendous, yes.  They don't work anymore.

Q       What do they, well when did they stop working?

A       Well, they work, but they just don't work quite as well as they used to.  I went to a physician to find out why.  And then they did some tests and told me I have difficulties, say, I can't squeeze a clothespin anymore.  Or, trying to button your pants or shirt, or it, it's, it's just getting worse as time goes on.  Before it was a weakness, now it just seems that.  When they're cold - -

Q       What about - -

A       When my hands are cold, they do not work at all, not nothing.  So I have to keep them warm in order for them to work.

Q       Now you have the, you have, you have Charp/Marie tooth disease.  Is that correct?

A       Yes, sir.

*                      *                      *

Q       Is there, now, now are you able to like use a knife and fork together to cut meat or something?

A       As I get older, it's getting more and more difficult.  I have noticed here recently in the last couple of years, it's getting extremely hard to write with a pencil, button my shirt, squeeze a clothespin, just little things that you take for granted.  Tearing open a pack of sugar, you know, like -        Q       Yeah.

A       For your coffee.  Just, or walking around with a cup of coffee, and then it falls out of your hand.  And you don't even know it.

*               *               *

BY ADMINISTRATIVE LAW JUDGE:

Q       Mr. Fullen, you can, yeah, just either call them.  They're in the Blue Pages of the phone book.  Or drop by and set up an appointment and see if they can help you.  As I say it doesn't cost anything.  Now how much do you think you could lift with both hands?  And, and I don't mean bend over to the floor.  But if you're sitting or standing at a table like you're at, how much do you think you could pick up and move for a refrigerator, move to another table?

A       40, 50 pounds.  I don't know.  I could  try.  80 pounds.  I don't know.  I know lifting it from the floor gives me extreme discomfort.

Q       Yeah, I know.

A       Lifting it from a table is a little bit easier.

Q       Now, does the Movik and Percacet do these  relieve the pain?

A       The Movik takes away the sharp of the arthritis, big deal.  And the knees and shoulders and neck.  The Percacet I only take if I can't stand it anymore.  And it does do the, what it supposed to.  Yes, it does take away the pain.  But I, I - -

*               *               *

Q       Do, do you have any other physical or mental conditions that affect your ability to work?

A       I have a, a learning disability that I've had since school.  But other than that, off the top of my head, not that I can think of.  Not that I'm aware of.  I have - -

Q       Did, yeah, so you were in special classes, and could ultimately finished high school.

A       Well, I wasn't going to let them kick me out, or make me quit.

Q       Now - -

A       I was in an LD class from kindergarten through my senior year.

Q       Yeah.

A       I have a difficulty with spelling, extreme difficulty with spelling.  Reading is mediocre at best.  And math is probably no better than times tables and divisions.  I'm not doing algebra.

Q       The - -

A       I have a different - -

Q       Now when you were, when you were driving a truck, you had to keep a log and read instructions and things like that, didn't you?

A       That's correct.  And that's about - -

Q       Now, how did that go?

A       Difficulty.  But I was able to do that, yes.

Q       Okay.

A       Keeping a log is relatively easy.

Q       Yeah.

A       Today's truck drivers - -

Q       [INAUDIBLE].

Q       Today's truck drivers probably have it easier with GPS.  But - -

Q        Yeah.

A        Me following a map or directions, I don't really have a problem following them. I have a problem when somebody tells me the directions and I have to write them down.  That's where the problem comes in, spelling and, or where somebody hands me directions to read, and, I don't rightly know the name of the street.  Then I just match up the letters.

Q        Uh-huh.  How do you spend your time all day?

A        I have my elderly parents that I moved up here.  And I take care of my daughter. And I help take care of my wife.  And I take care of the grass.  And essentially became Mr. Mom since I stopped working.

Q        How old is your daughter?

A        11.  And, I'm finding now - -

Q        [INAUDIBLE]

A        That I'm unable to help her with her homework anymore.  So now, mommy does it.

Q        Why is that?

A        Because she's spelling words I can't spell, doing math I can't do.  And - -

Q        Oh, so it's the, the learning disability kicking in there again.  Now do you do like, do you the cooking, the cleaning, dishes, laundry, that kind of stuff around the house?

A        I split it 50-50 with my wife.  She does the laundry and I do the cooking and we all share the cleaning.  We all make the mess.  I just do whatever I can to help.  I moved my elderly mother up here.  And, you know, try to help her a little bit, whether it's carrying in groceries or help out with mowing the yard.  Sometimes I hire little boy down the street, give

him a couple of bucks to come up and help weed whack or do little jobs that I can't do.

Q      You mow on like a riding motor, or - -

A      That's correct.

Q      Push mower.

A      Riding mower.  When it comes to weed whacking and push mower, that's when I get the little boy down the street.  Because I, riding it is not too bad.  But I cannot walk on that ground -

Q      Yeah.

A      Behind that mower.

Q      Right.

A      Weed whacking, I cannot do on the side of that hill.  My feet, my legs, I cannot do it.  It's just impossible.

Q      Now do you, you get out and go grocery shopping?

A      Yes, sir.  Yes, sir.  I - -

Q      How often do you do?

A      Once every two weeks.

Q      And, do you have any hobbies or anything you still enjoy doing that you can still do?

A      I really enjoy a little bit of fishing.  And my biggest love is hunting, which is getting severely, increasingly difficult to do because I can't walk.  I sound like an elephant going through the woods.  So, or I have to have somebody with me at all times.

Q      What, or how when did you last go hunting?

A        Turkey season of was '06, April of '06, May of '06.  I have a couple of guys that come down from outer state.  And they're with the National Wild Turkey Federation.  And, they usually go with me.

Q        Now, when you go hunting for turkeys, do you go with a shotgun or - -

A        Yes, sir.

Q        Bow and arrow?

A        Shotgun.  Shotgun.  I cannot - -

Q        [INAUDIBLE] - -

A        Use a bow.  I had to sell my bow because I can't pull it back.  I sold my motorcycle because I can't, my hands go numb, and I can't ride it.  I, I just had to get rid of it.  I used to be able to, but I can't anymore.

Q        How often do you, well when did you last go fishing?

A        July of this year.  I took my daughter.

Q        And where'd you go fishing?

A        We went fishing in just out here on the Ohio River, just took a John boat and we just sit in the John boat and - -

Q        What do you fish for?

A        Well, just anything that we catch and just thrown it back.  We don't eat them.  We just - -

Q        Oh, you don't keep it?

A        No, no, no.  We just sport thing.  Just teaching my daughter a little bit about the outdoors, to get her to outside.

Q       Do you ever get out, do you ever get out, go to church, movie, restaurants or anything like that?

A       When we can afford it.  We'll go to movies and dinner.  I don't - -

Q       [INAUDIBLE].

A       Really like going to the church too much because it's too much socializing.  and, I'm not really, I don't really enjoy a lot of people.  I don't, everybody at the church wants to know your business.

And I'm just not into - -

Q       Have you always been like that, you know, been a sort of a longer?

A       Yes.  Yes.  Well, everybody wants to pass judgment on you, you know, laugh at you because you can't walk or.  I just don't need it.

Q       Yeah.  Do you spend a lot of time watching TV or reading or anything?

A       I don't really enjoy TV.  The occasional show here and there.  But mostly, a little bit of reading.  But mostly just trying to work with my daughter and, and you know, do little things around the house, clean up, help where I can.  Do, you know, I help a lot with my, my mother and my daughter, whatever I can do.

Q       What kinds of things do you do for your mother?

A       Well I told you.  I mow the grass, you know, help her - -

                        *                *                *

Q       Okay.  and then do you have any, any, what do you do with the 60 acres?  Do you, do you have anything growing on it, or any animals?

A       We, current, when we first bought it the original intension was just no neighbors.

But then we, the tax break and all that, they told us about the farm tax break, so I had listed it as a farm. And I had the neighbors putting up the hay for the last ten years. And, they're getting older, and they decided to cut back. So they're not doing it anymore. So now I'm working with them so they come over and help. And most of it is done by the tractor. Matter of fact, all of it is done by the tractor. And the neighbor does half and I do half. And we just share it. And we just do my farm and his farm. And we might do - -

Q        Do you drive the, do you drive the tractor with the hay baler and the [INAUDIBLE] the - -

A        Yes.

Q        Harvester or the hay baler?

A        Right. And I do, and we have, I raise one or two cows just to put a little meat in the freezer and try to help out on the grocery bills, because I have no income at all. So, if I can sell a bale of hay or, or if I can do some little tractor work to help somebody, and they give me a couple of bucks, you know, anything I can do that I can pay a bill or at least buy my wife a present without using her money. I just - -

*               *               *

[EXAMINATION OF CLAIMANT BY ATTORNEY]  (Tr. 353)

Q        Were you having any difficulty with your hands and arms while you were driving trucks?

A        Toward the latter, yes.

Q        What difficulty?

A        Just not being able to push the tie bar down. Fingers going numb, holding on to

the steering wheel.  I have to keep switching hands.  Difficulty changing gears or flipping the selector or whatever, writing, doing your paperwork.  Trying to open the hood on a peter [phonetic] belt.  Trying to hold on to it strong enough to open it to do your checkout.  The - -

Q       If this difficulty - -

A       The biggest - -

Q       Contributes, okay.

A       Difficulty was pulling the fifth wheel pin.  And you're trying to disconnect the trailer.  Because that pin is so hard to pull, I have the muscle to pull, but not the strength in my hand to hold on to it.  So I made a steel bar so I could slip in there and use both hands and my foot to pull it.

Q       So did these difficulties contribute then to your decision to - -

A       Yes.

Q       Quit driving?

A       Yes.  It's kind of hard to, it's embarrassing to not to be able to perform the job.  People say well why didn't you do?  Well, except there's just some things you can't do.

*                *                *

BY ATTORNEY:

Q       How hard has it been for you to testify today?

A       Well, I'm not used, I, all my life I'm trying to hide this stuff, not share it.  So, let's say difficult.

Q       And, the difficulty that you have with public, did you notice it, for instances, when you were in high school?

A       Oh yes.  I - -

Q       And, how , how did that?

A       How did that happen?  Well, it kicked me out of high school and sent me to vocational school.  In my school there was 32 kids for the whole school?

Q       For the vocational?

A       Yeah.

Q       Uh-huh.

A       I could not, I did not do well in group situations.  I do not go to concerts.  I do not go to parties.  I do not go to church.

Q       Okay.  So how do you get along, for instance, with store clerks and that kind of thing?

A       Mediocre at best.  I try not to say anything and move on down the line.

*               *               *

E.       Lifestyle Evidence

The following evidence concerning the Claimant's lifestyle was obtained at the hearing and through medical records.  The information is included in the report to demonstrate how the Claimant's alleged impairments affect his daily life.

•       Feeds dog and cat.  (Tr. 91)

•       Walks dog with a 4 wheeler.  (Tr. 91)

•       Able to dress self and care for hair.  (Tr. 91)

•       Able to care for personal needs and grooming without reminders from others.  (Tr. 91)

•       Prepares own meals, including frozen dinners, soup and sandwiches, and meat.  (Tr. 92)

23

- Cooks, mows lawn with riding mower for between 10 minutes to 1 to 2 hours per week. (Tr. 92)

- Goes outside as often as he is able. (Tr. 92)

- Drives a car. (Tr. 93)

- Shops for an hour for food and every-day needs, three times per month. (Tr. 93)

- Pays bills, counts change, handles savings account, uses checkbook/money order. (Tr. 93)

- Hunts and hikes, but "hardly anymore." (Tr. 94)

- Fishes once in a while with friends. (Tr. 94)

- Spends time with family. (Tr. 94)

- Leaves house for dinners, Walmart, and doctors' appointments. (Tr. 94)

- Talks on the phone. (Tr. 94)

- Able to follow written instructions. (Tr. 95)

- Wears brace/splint when walking on uneven grounds and hills. (Tr. 96, 335)

- Helps elderly parents on day to day and drives them to doctors' appointment and errands. (Tr. 98)

- Able to walk on smooth, even surfaces. (Tr. 335)

- Takes Percocet five times per week, in the mornings. (Tr. 343)

### III.  The Motions for Summary Judgment

A.    Contentions of the Parties

Claimant contends the ALJ erred in analyzing his learning disability and in determining the impact on his RFC of pain and limitations arising from his Charcot-Marie-Tooth disease.  The

Commissioner contends the ALJ properly determined the severity of Claimant's learning disability and properly considered the impact of Claimant's disease on his RFC.

B.    The Standards

1.    Summary Judgment.  Summary judgment is appropriate if  "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to material fact and the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 569(c).  The party seeking summary judgment bears the initial burden of showing the absence of any issues of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  All inferences must be viewed in the light most favorable to the party opposing the motion.  Matsushita Elec.  Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  However, "a party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of [the] pleading, but...must set forth specific facts showing that there is a genuine issue for trial."  Anderson v.  Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).

2.    Judicial Review.  Only a final determination of the Commissioner may receive judicial review.  See, 42 U.S.C. §§ 405(g), (h); Adams v. Heckler, 799 F.2d 131,133 (4th Cir. 1986).

3.    Social Security - Medically Determinable Impairment - Burden. Claimant bears the burden of showing that he has a medically determinable impairment that is so severe that it prevents him from engaging in any substantial gainful activity that exists in the national economy.  42 U.S.C. §§ 423(d)(1), (d)(2)(A); Heckler v. Campbell, 461 U.S. 458, 460 (1983).

4.    Social Security - Medically Determinable Impairment.  The Social Security Act

requires that an impairment, physical or mental, be demonstrated by medically acceptable clinical or laboratory diagnostic techniques.  42 U.S.C. §§ 423(d)(1), (3); <u>Throckmorton v. U.S. Dep't of Health and Human Servs.</u>, 932 F.2d 295, 297 n.1 (4th Cir. 1990); 20 C.F.R. §§ 404.1508, 416.908.

5. <u>Disability Prior to Expiration of Insured Status- Burden</u>.  In order to receive disability insurance benefits, an applicant must establish that he was disabled before the expiration of his insured status.  <u>Highland v. Apfel</u>, 149 F.3d 873, 876 (8th Cir. 1998) (citing 42 U.S.C. §§ 416(I), 423(c); <u>Stephens v. Shalala</u>, 46 F.3d 37, 39 (8th Cir.1995)).

6. <u>Social Security - Standard of Review</u>.  It is the duty of the ALJ, not the courts, to make findings of fact and to resolve conflicts in the evidence.  The scope of review is limited to determining whether the findings of the Secretary are supported by substantial evidence and whether the correct law was applied, not to substitute the Court's judgment for that of the Secretary.  <u>Hays v. Sullivan</u>, 907 F.2d 1453, 1456 (4th Cir. 1990).

7. <u>Social Security - Scope of Review - Weight Given to Relevant Evidence</u>.  The Court must address whether the ALJ has analyzed all of the relevant evidence and sufficiently explained his rationale in crediting certain evidence in conducting the "substantial evidence inquiry." <u>Milburn Colliery Co. v. Hicks</u>, 138 F.3d 524, 528 (4th Cir. 1998). The Court cannot determine if findings are unsupported by substantial evidence unless the Secretary explicitly indicates the weight given to all of the relevant evidence.  <u>Gordon v. Schweiker</u>, 725 F.2d 231, 235-36 (4th Cir. 1984).

8. <u>Social Security - Substantial Evidence - Defined</u>.  Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.

Substantial evidence consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996) (citations omitted).

9. Social Security - Sequential Analysis. To determine whether Claimant is disabled, the Secretary must follow the sequential analysis in 20 C.F.R. §§ 404.1520, 416.920, and determine: 1) whether claimant is currently employed, 2) whether he has a severe impairment, 3) whether his impairment meets or equals one listed by the Secretary, 4) whether the claimant can perform his past work; and 5) whether the claimant is capable of performing any work in the national economy. Once claimant satisfies Steps One and Two, he will automatically be found disabled if he suffers from a listed impairment. If the claimant does not have listed impairments but cannot perform his past work, the burden shifts to the Secretary to show that the claimant can perform some other job. Rhoderick v. Heckler, 737 F.2d 714-15 (7th Cir. 1984).

C. Discussion

1. Whether the ALJ Properly Assessed Claimant's Learning Disability.

Claimant alleges the ALJ committed multiple errors when evaluating his learning disability, including a) erroneously categorizing his learning disability as "severe" in one segment of his analysis and "non-severe" in another portion of his analysis; b) finding his learning disability was not severe; c) failing to accommodate his learning disability in the RFC; and d) failing to grant Claimant's request for a consultative examination.

Commissioner argues the ALJ merely erred in stating in step two Claimant's learning disability was "severe" and that the error was harmless. Commissioner further alleges the ALJ properly determined Claimant's learning disability was non-severe and properly accounted for

the disability in Claimant's RFC.  Finally, Commissioner argues the ALJ did not err by refusing Claimant's request for a consultative examination.

As Claimant accurately alleges and Commissioner reasonably concedes, the ALJ was inconsistent throughout his analysis as to whether he found Claimant's learning disability to be a severe impairment.  In his findings of fact, the ALJ appeared to find Claimant's learning disability was severe, stating Claimant suffered from the severe impairments of "severe pain and limitations in the hands and feet due to Charcot-Marie-Tooth disease; recent onset carpal tunnel syndrome; and a history of learning disorder."  (Tr. 18).  Subsequently, the ALJ, during his consideration of the Listings, appeared to find Claimant's learning disability was not severe, stating "although the claimant alleges learning disability, there is no documentation to substantiate this claim as a severe impairment;" "the likelihood of a low enough IQ to merit consideration as a Listing level impairment is extremely unlikely;" and "the evidence shows that, as of the date last insured, any mental impairment was 'not severe.'" (Tr. 19).  Finally, in determining Claimant's RFC, the ALJ explained, "there was insufficient evidence to establish any severe . . . mental impairments at the claimant's date last insured . . . ."  (Tr. 21).

The Court finds that the ALJ's error, namely his inconsistency in characterizing Claimant's learning disability as severe and not severe, does not warrant remand.  Looking to the ALJ's analysis of the Listings and determination of Claimant's RFC, the Court finds the ALJ's conclusions on those matters did not rest on his characterizing Claimant's learning disability as a severe or non-severe impairment, but rather on his consideration of the evidence in the record.  Accordingly, his error was harmless.  See Morgan v. Barnhart, 142 Fed. Appx. 716, 723 (4th Cir. 2005), citing Ngarurih v. Ashcroft, 371 F.3d 182, 190 n.8 (4th Cir. 2004) [holding errors not

effecting the substance of a decision are deemed harmless and normally do not warrant remand].

Regarding Claimant's assertion the ALJ erred in concluding his learning disability was not severe, the Court finds Claimant's assertion is without merit. Although Claimant's school records establish his mental limitations throughout his school years, the record also establishes he graduated from high school, was able to complete his duties as a truck driver, and retained the ability to care for himself, shop, and drive a car, amongst other activities. (Tr. 58, 91-94, 329, 333). As Commissioner accurately notes, the fact Claimant received special education services does not, alone, establish Claimant is disabled. See 20 C.F.R. § 416.924a(b)(7)(iv). Rather, that fact will be considered in combination with all other relevant evidence.

Regarding Claimant's assertion the ALJ erred in neglecting to accommodate Claimant's learning disability in his RFC, the Court finds Claimant's assertion is without merit because Claimant's RFC is supported by substantial evidence. Specifically, Claimant's lifestyle evidence and the medical record fail to document any limitation arising from his learning disability that warrants accommodation in the RFC. Nevertheless, the Court finds remand is necessary because the ALJ failed to consider a limitation he identified as arising from Claimant's learning disability. Specifically, in the discussion of the Listings, the ALJ concluded Claimant's learning disability imposed "mild limitations in concentration, persistence and pace." (Tr. 19). While not obligated to accommodate every non-severe limitation in Claimant's RFC, the ALJ has, at a minimum, a duty to consider limitations arising from a claimant's impairments. See 20 C.F.R. § 404.1520(e); SSR 96-8p. Having himself identified a limitation arising from Claimant's learning disability, the ALJ had a minimal duty to consider the impact of that limitation on Claimant's work-related abilities. Because his discussion of Claimant's RFC fails to mention that

limitation, remand is necessary.

Finally, regarding Claimant's allegation the ALJ erred by refusing to grant his request for a consultative examination, the Court finds Claimant's allegation is without merit.  Section 404.1519a of Title 20 of the Code of Federal Regulations sets forth when a consultative examination may and must be ordered: where "the evidence as a whole, both medical and non-medical, is not sufficient to support a decision on the claim," a consultative examination may be purchased; where the additional evidence needed is not contained in the medical records, or where there exists a conflict or insufficiency in the evidence, a consultative examination is required.  Ultimately, the decision whether to order a consultative examination rests with the ALJ.  See Diaz v. Secretary of HHS, 898 F.2d 774, 778 (10th Cir. 1990); Wren v. Sullivan, 925 F.2d 123, 128 (5th Cir. 1991).  In the present case, the evidence in the record, as explained above, was sufficient to support the ALJ's determinations regarding severity of Claimant's learning disability, whether the disability met/equaled a Listing, and Claimant's RFC.  The evidence did not present a conflict or insufficiency regarding Claimant's learning disability requiring further medical evidence.  Accordingly,  the ALJ did not err by failing to order the consultative examination.

2.      Whether Claimant's RFC is Supported by Substantial Evidence.

Claimant contends his RFC is not supported by substantial evidence. Specifically, he claims substantial evidence does not support the absence of accommodation in the RFC for pain arising from his Charcot-Marie-Tooth disease.  Claimant also claims substantial evidence does not support the ALJ's finding he retains the ability to perform light work.  Commissioner contends substantial evidence supports Claimant's RFC.

At step four of the sequential analysis, the ALJ must determine the claimant's RFC. 20 C.F.R. §§ 404.1520, 404.1545. The RFC is a determination of the most a claimant can do despite his limitations. 20 C.F.R. § 404.1545. A claimant's RFC is to be determined only after the ALJ has considered all the relevant medical evidence of the claimant's impairments as well as descriptions of subjective symptoms such as pain. Id. at § 404.1529(a); see, also, Hines v. Barnhart, 453 F.3d 559, 563 (4th Cir. 2006). Symptoms of pain must be considered in accordance with the two-step process set forth in Craig, 76 F.3d at 585. First, the ALJ must determine whether there exists a medically determinable impairment capable of causing the symptoms alleged. Id. at 594. Second, if the claimant makes this showing, the ALJ must evaluate the intensity and persistence of the symptoms and the degree to which they impact the claimant's work-related abilities. Id. at 595. The evaluation in the second prong must consider the claimant's own statements about pain as well as objective medical evidence in the record. The claimant's own statements need not be credited to the extent they are inconsistent with the objective medical evidence or to the extent the underlying objective medical impairment could not reasonably be expected to cause the symptoms alleged. Id.

The ALJ in the present case found Claimant suffered from "severe pain and limitations in the hands and feet due to Charcot-Marie-Tooth disease." (Tr. 18). The ALJ then concluded Claimant retained the capacity to perform "light work with the ability to briefly (one to two minutes) change positions at least every fifteen minutes; no exposure to extreme cold; standing and/or walking should be on a level surface only; no bending at the waist more than occasionally and never more than 45 degrees; and no more than frequent use of the hands for fine fingering, grasping or twisting." (Tr. 19). In support of his determination of Claimant's RFC, the ALJ

explained that while objective medical evidence established Claimant suffered from Charcot-Marie-Tooth disease, the medical evidence and lifestyle evidence dating from before or on the date last insured, March 31, 2001, failed to establish Claimant suffered from the degree of pain and limitation alleged. (Tr. 20). Even when considering the medical and lifestyle evidence dated after March 31, 2001, the ALJ came to the same conclusion.

The Court finds Claimant's RFC is supported by substantial evidence. As the ALJ properly observed, the medical evidence clearly establishes Claimant suffers from Charcot-Marie-Tooth disease, a neurological disorder associated with pain and limitations in the hands and legs.[5] However, as the ALJ found, the medical evidence dated on or before March 31, 2001 fails to establish the pain or limitations arising from Claimant's disease disables Claimant. To the contrary, while the evidence established he walked with a slightly unsteady gait, required braces to walk on uneven surfaces, and had decreased muscle strength and reflexes, (Tr. 96, 199-200, 335), the evidence also established he had good muscle tone, "normal" upper and lower extremities, and the ability to care for himself, prepare meals, drive a car, shop, and hunt and hike (although "hardly anymore"). (Tr. 91-94, 199, 209). Despite the limited objective medical evidence, the ALJ nevertheless credited Claimant's statements and included in the RFC accommodations for his alleged limitations in sitting, standing, walking on uneven terrain, use of his hands, and working in cold temperatures. (Tr. 19, 95, 96, 335, 336). Accordingly, the Court finds Claimant's RFC is supported by substantial evidence.

---

[5] National Institute of Neurological Disorders and Stroke, Charcot-Marie-Tooth Disease Fact Sheet, http://www.ninds.nih.gov/disorders/charcot_marie_tooth/detail_charcot_marie_tooth.htm #97383092 (accessed March 6, 2008).

Regarding Claimant's assertion he is not able to perform light work, the Court finds the evidence dated on or before March 31, 2001 establishes Claimant, on or before March 31, 2001, retained the ability to perform light work. While Claimant's condition appears to have deteriorated since March 31, 2001, the Court's consideration is limited to whether substantial evidence dating from the relevant period, on or before March 31, 2001, supports the ALJ's decision. For this reason, the Court's findings and recommendations may not be disturbed by evidence of recent changes to Claimant's condition.

## IV. Recommendation

For the foregoing reasons, I recommend that:

1.      Claimant's Motion for Summary Judgment be **<u>GRANTED</u>** and the case REMANDED for further determination of Claimant's RFC and, specifically, consideration of the limitation identified by the ALJ as arising from Claimant's learning disability. The Court so recommends despite finding the ALJ's findings regarding the severity of Claimant's learning disability, analysis of the Listings, and Claimant's RFC are supported by substantial evidence.

2.      Commissioner's Motion for Summary Judgment be **<u>DENIED</u>** for the same reasons set forth above.

Any party who appears *pro se* and any counsel of record, as applicable, may, within ten (10) days after the date of this Order, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should be submitted to the District Court Judge of Record. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such

Report and Recommendation.


DATED: March 12, 2008

/s/ James E. Seibert
JAMES E. SEIBERT
UNITED STATES MAGISTRATE JUDGE